## PAULY v. WILSON.

(Circuit Court, S. D. California.    August 21, 1893.)

### No. 356.

NEGOTIABLE INSTRUMENTS—ACTION ON NOTE—PAYMENT—CONVERSION OF COL-
LATERAL SECURITY.

   In an action by a bank on a promissory note, it appeared that defendant
   delivered as security the promissory note of S., to which was annexed,
   as collateral security, a certificate of corporate stock in the name of S.;
   that defendant, with the consent of S., agreed that the bank might sell
   the stock, and take in place of the note of S. the note of the purchaser,
   secured by the same stock reissued in the name of the purchaser; and that
   the bank sold the stock, and took in payment notes secured by the stock,
   payable to itself, with which notes defendant had no connection, and
   over which he had no control. *Held* that, as the bank had converted the
   stock to its own use, defendant's note must be credited with the value
   of the stock at the time of conversion.

   At Law.    Action by Frederick N. Pauly, as receiver of the Cali-
fornia National Bank of San Diego, against Warren Wilson, on a
promissory note.    Judgment for defendant.

   M. T. Allen, for plaintiff.
   Conklin & Hughes, for defendant.

   ROSS, District Judge.    This is a suit upon a certain promissory
note for $9,306.50, with interest, executed by the defendant on
the 13th of June, 1891, payable three months after date to the
California National Bank of San Diego, of which the plaintiff is,
and was at the time of the commencement of the action, the duly
appointed, qualified, and acting receiver.    This note was a re-
newal of a similar note from the defendant to the bank.    At the
time of the execution of the original note given by the defendant
for the money loaned to him, there was delivered by defendant
to the bank, as collateral security for the repayment of the money,
with interest, a certain promissory note of one Smith, to which
was annexed, as collateral security for its payment, a certificate in
Smith's name for 220 shares of the stock of a California corporation
called the San Diego Sun Company, which collateral continued as
security for the note sued on.    It is not claimed that the defend-
ant has ever repaid the money, or any part of it, for which the
note sued on was executed, nor is it pretended that the bank or
the receiver has ever in fact received any part of the principal
thereof, or of the interest thereon; but it is contended on the part
of the defendant that certain transactions were had with respect
to the collateral security which amounted, in law, to a conversion
on the part of the bank of the 220 shares of the stock of the San
Diego Sun Company, claimed to have been at the time worth $40
a share, and to this extent it is said the note of the defendant
should be credited.

   The facts in respect to the note of Smith, and the annexed cer-
tificate in his name for 220 shares of the stock of the Sun Com-

pany, appear to be these: For some reason not appearing, it was desired by the president of the bank, who was a man named Collins, and by the president of the Sun Company, who was W. E. Simpson, to get Smith out of that company, and with defendant's consent, as also with that of Smith, Simpson was deputed to find a purchaser or purchasers for the 220 shares of stock owned by Smith, and then held, together with Smith's note, by the bank, as collateral security for the payment of defendant's note for $9,306.50 with interest. Accordingly, Simpson sold 45 of those shares, together with 5 other shares, to L. A. Wright, taking in payment therefor Wright's note for $2,000, payable three months after date to the California National Bank of San Diego, and to A. H. Isham he sold 175 of the shares, taking in payment therefor Isham's promissory note for $7,000, payable three months after date to himself. The certificate for the 220 shares of stock owned by Smith was thereupon surrendered, and in lieu thereof a certificate for 175 shares was issued to A. H. Isham, and a certificate for 45 shares was issued to L. A. Wright. The certificate to Isham was indorsed by him, and annexed to his $7,000 note made payable to Simpson as collateral security for its payment, and the certificate for the 45 shares issued to Wright, together with a certificate for the additional 5 shares sold to him, were indorsed by Wright, and annexed to his note for $2,000 made payable to the California National Bank of San Diego as collateral security for its payment. The $7,000 note made payable to Simpson was by him indorsed in blank, and both notes, together with the annexed certificates of stock, were by him delivered to the bank in lieu of the Smith note and the Smith certificate for 220 shares. The note of Smith was thereupon surrendered by the bank to the defendant, Wilson, and by him to Smith, its maker.

Previous to the sale of the 175 shares of the stock to Isham, there had been executed in writing by Isham and Simpson the following instrument, marked "A:"

"I, A. H. Isham, of San Diego, California, hereby agree, upon demand, to indorse for W. E. Simpson to the amount of $7,000: provided, that for such indorsement I shall receive from said W. E. Simpson $7,000 worth of the San Diego Sun Publishing Company stock at par, which is $40 00/100 per share, free of all incumbrance, and that I shall be entitled to my proportion of the book debts owing to said San Diego Sun Publishing Company, as appear on the books upon the date of my acceptance of said note for $7,000, and, further, that said W. E. Simpson agrees and hereby binds himself not to at any time dispose of any of the stock now held by him in said San Diego Sun Publishing Company without first offering the same to me, and with a reasonable time—say two week—to arrange for the purchase of same, at the same price as others are willing to pay for said stock. That the said W. E. Simpson is now the owner of 260 shares of said San Diego Sun Publishing Company stock, and the said W. E. Simpson furthermore agrees that he will not dispose of said stock except the purchaser or purchasers will also agree to buy the $7,000 worth of stock as herein mentioned, to be assigned to me (A. H. Isham) at the same price, terms, and conditions upon which said W. E. Simpson agrees to sell. The San Diego Sun Publishing Company is a corporation existing under the laws of the state of California, with a capital stock of $50,000, and the amount paid up is $20,000. The stock referred to above is the paid-up stock. This agreement also includes that

I (A. H. Isham) shall be entitled to my proportion of receipts over and above expenses from the job office now in operation in connection with said San Diego Sun Publishing Company, in proportion as 7 is to 20. The notes indorsed to be payable at not more than $1,000 of principal per annum, with interest.

[Signed]                                      "A. H. Isham.
[Signed]                                      "W. E. Simpson."

At the time of the sale of the 175 shares of the stock to Isham, and as a part of that transaction, there was executed in writing, by Simpson and Isham, the following instrument:

"Received of A. H. Isham this day his note for seven thousand dollars in fulfillment upon his part of contract marked 'A,' in consideration of which I agree to at once deliver to him 175 shares of stock in the San Diego Sun Co., paid-up stock, (at forty dollars per share,) the said note to be renewed quarterly, and one thousand dollars paid annually on the same until fully liquidated; and I furthermore guaranty, in consideration of his purchase of said stock, that, in addition to the contract between us marked 'A,' that no contract or agreement in reference to the disposition or otherwise of the stock now held by the parties named in contract A shall be entered upon without the full knowledge and consent of both. This condition also refers to any intention to increase the capital of said San Diego Sun Co. Further, that said A. H. Isham allows the full amount of stock issued in his name to remain as collateral until it is fully released by payment of this obligation; that is to say, as each payment in gold coin is made of the principal, that a corresponding amount of stock shall be released. W. E. Simpson further agrees that no greater charge than $25 00/100 per week shall be made for his service, unless with the consent of A. H. Isham, and that no one will be employed in the Sun office at a greater salary than $30 00/100 (thirty) per week. That the stock purchased by A. H. Isham is that once owned by Warren Wilson, and in no way lessens the holding of the majority of stock now held by W. E. Simpson.

[Signed]                                       "W. E. Simpson.
"Accepted:                                          A. H. Isham."

Defendant agreed with the bank that Simpson should sell the Smith stock, and take the note of the purchaser or purchasers for the purchase price, payable three months after date, secured by a pledge of the stock. Smith also consented that his stock, held as it was as collateral security for the payment of his note to defendant, should be sold, and when sold he received the surrender of his note in consideration of the sale of his stock. But defendant's agreement with the bank was that the note or notes to be taken for the Smith stock were to take the place of the Smith note owned by him, and pledged to the bank as collateral security for the payment of his own note, and were to be secured by the same stock reissued in the name of the purchaser or purchasers. Such note or notes, so secured, would have been his property, although held by the bank as collateral security for the payment of defendant's note, and subject to his disposition upon the discharge of the obligation for which they were held as security. But the bank did not dispose of the Smith stock in accordance with that agreement, or upon that basis. It sold it for two promissory notes, one of which was made payable directly to itself, and the other made payable to Simpson, and by him indorsed in blank to the bank, and each of which was secured by the Smith stock re-

issued in the name of the purchaser and maker of the notes, respectively. It thus assumed absolute dominion and control over the stock, and disposed of it without the consent and contrary to the agreement of the defendant. It thereby converted it to its own use.

In the transaction with Isham and Wright, the purchasers of the stock, defendant was not known. Indeed, it is quite evident that in the transaction between Simpson and Isham the bank was not known, for Isham's note for the purchase price of the 175 shares was made to Simpson, who, in the contemporaneous written agreement, recited that the transaction was in fulfillment of the previous written agreement between him and Isham, and who further agreed that, although the note was upon its face made payable three months after date, that but $1,000 of the $7,000 for which it was executed should be paid annually, and that the note should be renewed quarterly. The testimony of Simpson is that the president of the bank knew of that contemporaneous agreement, and ratified it. It is not necessary to decide whether the bank would be bound by such action of its president, assuming such knowledge. Defendant did not know of it, and consequently never consented to it. The bank, having treated the stock as its own, —having sold it, taking in payment therefor notes secured by the stock, payable to itself, with which defendant had no connection, and over which he had no control,—must be held to have converted it to its own use, and defendant's note must be credited with its value at that time, which I find from the evidence to have been $40 a share. There will be findings and judgment in accordance with these views.